**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

**ZAMBELLI FIREWORKS MANUFACTURING
CO., INC. doing business as ZAMBELLI
FIREWORKS INTERNATIONALE,**

     **Plaintiff,**

  **v.**

**MATTHEW WOOD and PYROTECNICO F/X,
LLC.,**

     **Defendants.**

)
)
)
)
)
)
)
)
)
)

 **2:08-cv-415**

## FINDINGS OF FACT, CONCLUSIONS OF LAW
## AND ORDER OF COURT

Now pending before the Court is a MOTION FOR PRELIMINARY INJUNCTION
(Document No. 4) filed by Plaintiff Zambelli Fireworks Manufacturing Co., Inc. ("Zambelli")
against a former employee, Matthew Wood, and a competitor, Pyrotecnico F/X, LLC
("Pyrotecnico") to enforce the restrictive covenants in an Employment Agreement executed
between Zambelli and Wood.

On August 25-27, 2008, the Court conducted an evidentiary hearing on Plaintiff's motion.
Zambelli presented as witnesses Dr. George Zambelli, Jr., current chairman of the Board of
Directors and owner of 50% of the stock of Zambelli; Ernest Simmons, a long-time Zambelli
pyrotechnician in its Florida office; and Douglas Taylor, current chief executive officer ("CEO")
of Zambelli. Pyrotecnico called as a witness Stephen Vitale, president and managing member of
the Pyrotecnico group of companies. Wood testified on his own behalf. The testimony of two

witnesses, Marcia Ann Zambelli Fumagali, and Danabeth Zambelli Trasatti,[1] was submitted by deposition. The parties have submitted post-hearing Proposed Findings of Fact and Conclusions of Law (Document Nos. 49, 50) and responses thereto, all of which filings were complete as of November 12, 2008. The request for injunctive relief is therefore ripe for disposition.

The Court issues the following Findings of Fact and Conclusions of Law in accordance with Fed. R. Civ. P. 52 and 65.

## I. FINDINGS OF FACT

A.    The Companies and Industry

1.    Zambelli is in the business of selling, staging and performing fireworks displays and is one of the oldest and largest fireworks companies in the United States. Zambelli currently does business in approximately 40 states, but regards its market as nationwide, if not international. Until his death in 2003, George Zambelli, Sr. was the majority shareholder, CEO, and essentially ran the company. After his death, his daughters Marcy and Danabeth assumed primary responsibility for day-to-day operations. Although corporate titles were not relegated much importance within the organization, Marcy was named the Chief Executive Officer and Danabeth became the President. George Zambelli, Jr., was and is primarily employed as an opthalmologist, but he is also active in the fireworks business with special projects, documentaries, and during the July 4th busy season.

---

[1] For the sake of convenience, and consistent with the witnesses' own usage, the Court will generally refer to members of the Zambelli family by their first names. The Court notes that Marcia Ann Zambelli is typically referred to as Marcy. The close relationship between the sisters with regard to their business activities led witnesses to refer almost universally to both sisters at the same time, i.e., "Marcy and Danabeth."

2.     Defendant Pyrotecnico has also been in the fireworks display business for decades. Defendant Pyrotecnico is comprised of several related companies, all of which are managed by Stephen Vitale.  While Matthew Wood is employed by Pyrotecnico F/X, LLC, he has performed work for several of the Pyrotecnico entities.

3.     The fireworks industry in the United States is quite competitive.  The industry has at least five "large" entities, including Zambelli and Pyrotecnico, defined as those with annual revenues in excess of $5 million.

4.     Both Zambelli and Pyrotecnico have their main offices in New Castle, Pennsylvania.  Employees of both companies regularly see one another, socialize together, and many are friends.  Pyrotecnico has lost employees to Zambelli, and has had employees come to it from Zambelli.  Indeed, a member of the Zambelli family, Lou Zambelli, an uncle to George Zambelli, Jr., went from Zambelli to Pyrotecnico, and back to Zambelli over the years. Pyrotecnico has never pursued Zambelli employees while they were actively employed there.

5.     Each company has offices in other states.  Matthew Wood worked in Zambelli's Florida office.  Both Zambelli and Pyrotecnico have lured customers from one another in the course of competition, and both have lost customers to other competitors.

6.     The fireworks or pyrotechnics industry operates by obtaining materials, that is, the fireworks shells, almost exclusively from China; finding customers and selling shows; and successfully executing the shows.

7.     To carry out their business, both companies use persons in specific categories of jobs relevant to this dispute.  A show designer, also known as a choreographer, performs the artistic act of combining the fireworks display with music.  A "shooter," or pyrotechnician, is a

field person who executes the fireworks display on-site.

8.    Choreography is typically accomplished through the use of computer software programs which are available in the public domain. The program used by Zambelli is called Fire One. Pyrotecnico uses a program called Pyrodigital. These programs are purchased and used off-the-shelf, and are available to the general public. They are not owned by the customer, and cannot be modified for a particular purchaser. When choreographing a fireworks display, the actual geographic location of the show is virtually immaterial, because the show is designed on a personal computer.

B.    <u>Matthew Wood's Education and Work History</u>

9.    Matthew Wood is a thirty-one year-old pyrotechnics designer/choreographer.

10.    Wood's father, a pyrotechnic hobbyist and technician, introduced him to pyrotechnics at a young age.

11.    Knowing that he wanted to pursue a career in the pyrotechnics industry, Wood obtained an associate's degree in technical theatre from Vincennes University and a bachelor's degree in theater from Indiana State University.

12.    In his employment positions prior to working for Zambelli, Wood gained experience in various aspects of the pyrotechnics field including: sales, agreements, design work, effects, and pyrodigital software. Wood had experience with stage pyrotechnics and had made some home fireworks, but had little experience in aerial fireworks displays on the scale of Zambelli's major shows.

13.    Wood was personally interviewed for employment by George Zambelli, Sr. in 2001.

14.    In preparation for his interview with Mr. Zambelli, Wood downloaded a demonstration copy of the Fire One software program and began to familiarize himself with that program.

15.    George Zambelli, Sr. hired Wood specifically to assist Marcy and Danabeth, who ran the Florida office.  Wood's initial duties involved work on new and existing accounts (outdoor and indoor displays), calling on customers, applying for permits, reviewing the fireworks sites, attending trade conferences, and whatever else was asked of him.  Wood's responsibilities expanded over time.

16.    Zambelli provided Wood with valuable training throughout his employment.  In particular, Ernie Simmons taught Wood how to efficiently lay out and choreograph shows and provided instruction on the Zambelli setup and systems.  Wood also gained hands-on experience as a helper in actually shooting aerial fireworks displays.  In 2007, Zambelli paid for Wood to become a certified trainer for the Pyrotechnic Guild International ("PGI").  During his employment at Zambelli, Wood also became licensed in Colorado and New York.

17.    Wood worked very closely "hand in hand" with Marcy and Danabeth in various aspects of the business and would do virtually anything that the sisters asked him to do.

18.    As Wood became more experienced, he became responsible for preparing business proposals which involved pricing information and contracts, site evaluation, choreography, obtaining permits, and calling on Zambelli's customers.

19.    During his employment by Zambelli, Wood acquired and developed unique skills that are very specific to the pyrotechnic industry.  Zambelli promoted Wood as one of its premier choreographers and Wood designed some of Zambelli's highest-profile shows, including the

New York City Times Square New Year's Eve show, the Aquatennial show in Minneapolis, Sky Blast in Pittsburgh, and Gasparilla in Florida.

20.   While he was employed with Zambelli, Wood conducted sales but was not assigned a specific territory.  Wood had extensive communications with clients and he would interact with them in preparation for their shows and follow-up afterwards.

21.   Wood had interaction with the following clients during the course of his employment with Zambelli: Colorado Rockies (Tucson, AZ and Denver, CO); Exquisite Event Planning, Trabuco, CA; Soboba Casino, San Jacinto, CA; City of Alhambra, CA; Knott's Berry Farm, Buena Vista, CA; City of Huntington Beach, CA; County of Los Angeles, Marina Del Rey, CA; Channel Island Harbor Foundation, Oxnard, CA; United States Marine Corps, Twenty-Nine Palms, CA; MTV My Sweet 16 Party, Long Beach, CA; The Monte Fund Show, Aptos, CA; The Queen Mary, Long Beach, CA; Presidential Inauguration, Washington, D.C.; Gasparilla Festival, Tampa, FL; Hard Rock Hotel and Casino, Hollywood, FL; SunFest of Palm Beach County, West Palm Beach, FL; Orange Bowl, Miami, FL; Turner Field, Atlanta, GA; Inner Harbor, Baltimore, MD; Macy's, Southfield, MI; Aquatennial Festival, Minneapolis, MN; Avi Hotel & Casino, Laughlin, NV; Nellis Air Force Base, North Las Vegas, NV; Seneca Casino, Salamanca and Niagara, NY; Times Square, New York, NY; Kiowa Casino, Devol, OK; Wildhorse Resort and Casino, Pendleton, OR; Sunoco Sweet Sounds of Liberty Concert and Fireworks/Welcome America, Philadelphia, PA; Mt. Rushmore, S.D.; Minor League Baseball Trade Show, TN.

C. The Employment Agreements

    22.    Upon being hired by George Zambelli, Sr. in 2001, Wood signed an employment agreement which contained a twenty-four month non-competition provision (the "2001 Agreement").

    23.    The 2001 Agreement contained an arbitration provision which required that any action to enforce the agreement be conducted through private arbitration.

    24.    As the employment relationship between Wood and the Zambelli family continued and developed, the family considered Wood to be the "next generation" and "future of the company." However, Wood was never offered an opportunity to own stock in Zambelli.

    25.    The 2001 Agreement was "superseded" by another employment agreement that Wood signed on June 2, 2005 (the "2005 Agreement").

    26.    George Zambelli, Jr. testified that a primary reason why Wood was requested to sign the 2005 Agreement was to bind Wood to the company through the next generation.

    27.    The 2005 Agreement contained, *inter alia*, the following additional restrictions:

    (a)    A provision purporting to prohibit Wood from engaging "in any manner" in the pyrotechnic business within the Continental United States or taking a position of employment with a company engaged in the pyrotechnic business for two years after leaving the company.

    (b)    A two-year non-solicitation provision.

    (c)    A confidentiality provision preventing disclosure of trade secrets and materials.

    (d)    A provision that Wood provide Zambelli with three-months notice of resignation.

    (e)    A provision stating that consideration consisted "of the mutual

covenants and agreements set forth following and intending to be legally bound...."

(f)     A provision specifically stating that if a Court should determine that the terms of the non-compete agreement are unreasonable, the remedy shall be modification of the Agreement to less restrictive terms rather than voiding the Agreement.

(g)     A provision requiring Wood to pay all legal fees, court costs and expenses incurred by Zambelli if Zambelli prevails in legal proceedings to enforce the Agreement.  (Pyrotecnico has agreed to reimburse Wood for any such legal expenses.)

(h)     A provision stating that Pennsylvania law shall apply.  There is no arbitration provision.

D.    <u>Consideration</u>

28.     The 2005 Agreement was entitled "Employment Agreement for New Employee" and stated that the consideration for the Agreement was the offer of employment, even though Wood had been employed there for several years by that time in 2005.  Wood specifically spoke to Danabeth and raised the fact that the Agreement reflected "New Employee" but she downplayed it and told Wood not to worry and that everything was fine.

29.     This exchange between Wood and Danabeth illustrates the lack of business formalities with which the Zambelli daughters operated the corporation and the close working relationship and trust that existed between the Zambelli daughters and Wood.

30.     Wood's compensation increased every year while he was employed at Zambelli.

31.     As alleged consideration for signing the new employment agreement, Wood's base salary increased from $1,571.81 to $2,115.39 per pay period, an increase of 34.5%.

32.     When Wood signed the 2005 Agreement, there was a potentiality that he would earn less in "shooter fees" than he had earned in prior years by going to shows and actually

shooting the fireworks. Marcy and Danabeth told Wood that he would be spending more time in the office and that he would have less time to actually shoot shows, and that he would have to request permission to engage in shooting. The increase in salary which Wood received contemporaneous with the 2005 employment agreement was the figure requested by Wood based on his calculation of what he would need to earn without the availability of shooter fees. The shooter fees that Wood earned for the 2005 July 4th shows were already planned and were not part of the June 2005 arrangement.

33.     The difference between what Wood was guaranteed to make in 2005 ($55,000) and what he actually earned in 2004 ($52,997) was $2,003. With "shooting" income included, Wood actually earned $62,307 in 2005, an increase of approximately $9,300 over his 2004 income.

34.     No Zambelli witness with first-hand knowledge could identify any new duties or responsibilities or authority assigned to Wood after entering into the 2005 Agreement; rather, he continued to perform his same duties and functions and was expected to "continue to progress" in them. In actuality, new duties and increased access to Zambelli's pricing information by Wood did not come with the 2005 Agreement, but instead occurred in 2007 following a corporate restructuring.

35.     Marcy and Danabeth were the persons involved on behalf of Zambelli in having Wood sign the 2005 Agreement. Both sisters testified that the 2005 Agreement was presented to Wood because he wanted and/or was getting a raise in base pay to offset a potential decrease in income which Wood earned as a shooter.

E.    The Corporate Restructuring

36.    Zambelli had historically been a family business with 100% of the corporate stock owned by Zambelli family members at the time Wood was hired.

37.    During the initial interview process, George Zambelli, Sr. stressed to Wood that the company was a family owned and operated organization.

38.    The long-standing family nature and identity of Zambelli was what attracted Wood to the company, and was a "touchstone" in his acceptance of the offer of employment from George Zambelli, Sr. in 2001.  George Zambelli, Sr., died in December 2003.

39.    In May 2007, a major sale of Zambelli stock took place.  The transaction was structured as a stock sale, as opposed to an asset purchase, for several reasons, including the retention of various state and federal permits, licenses and contractual relationships.

40.    The stock sale resulted in a number of significant changes in the company:

    (a)    George Zambelli, Jr. became the sole Zambelli family member retaining stock ownership in the company.  His stock ownership interest increased from 20% to 50% and he acquired a right of first refusal to purchase all outstanding stock in the corporation from the other shareholders.

    (b)    The following members of the Zambelli family relinquished their shareholder status in the corporation and resigned their respective positions as officers and directors: Marcy as CEO; Danabeth as President; another sister Ana Lynn, as secretary; and their mother, Constance, as treasurer.  As part of the transaction, Marcy and Danabeth entered into employment and non-competition agreements which provided that they would serve as executive vice presidents until May 2008, although they were not obligated to work more than 30 hours per week after September 30, 2007, 20 hours per week after October 31, 2007 and 10 hours per week after December 31, 2007.

    (c)    Six Zambelli family members had previously comprised the Board

of Directors; only George Zambelli, Jr. remains on the Board. George Zambelli, Jr. is primarily employed as an opthamologist and has never been actively involved in day-to-day operations – neither before nor after the corporate restructuring.

(d)    A new investor group, consisting of Richard McDonald, Gary McKnight, Ed Myers, and Douglas Taylor acquired the remaining 50% stock ownership interest. They comprise the Board of Directors, along with George Zambelli, Jr. These gentlemen are the first non-Zambelli family shareholders in the history of the corporation.

(e)    Douglas Taylor was selected to replace both Marcy and Danabeth as CEO and President. Taylor had no prior experience in the fireworks business.

(f)    Taylor works from the New Castle headquarters.

41.    Following the stock transaction, Marcy and Danabeth were phased out of their operational duties, and were completely removed from the business by the end of 2007.

42.    In late 2007, Taylor met with Wood, Simmons, Marcy and Danabeth to discuss the transitioning of responsibility for various customers. Wood was assigned primary responsibility for customers in fourteen states: Alabama, Colorado, Delaware, Florida, Georgia, Massachusetts, Michigan, Minnesota, New York, Indiana, Pennsylvania, South Dakota, Tennessee and West Virginia. Marcy and Danabeth did not undertake extensive efforts to formally transfer responsibility or to introduce Wood to customers as the new primary contact.

43.  Until the May 2007 sale of Zambelli stock to non-family members, Wood intended to remain working for the Zambelli family for a long time and had no intention of leaving.

44.     Following the May 2007 Zambelli stock sale, Wood began to lose trust in

the security of his position and the future of the company for a number of reasons

including:

(a)     His belief that the Zambelli sisters were being pushed out of the business
        involuntarily because he observed them becoming less active and more
        distraught.

(b)     Marcy and Danabeth told Wood that the new CEO Douglas Taylor was not
        to be trusted and that he had lied to the family several times.

(c)     George Zambelli, Jr. told  Wood that he should watch his back because
        Taylor was a back stabber and couldn't be trusted.

(d)     Long-time Zambelli employee Ernest Simmons related to Wood his
        experiences with other corporate takeovers which had resulted in failures
        of the targeted companies after total depletion of their funds.

(e)     Simmons observed that there was increasing concern among employees in
        the Florida office about the future of the company which uncertainty had
        never existed when the company was family-owned.

(f)     Wood became increasingly stressed as he was being assigned more and
        more duties.

45.     As the Zambelli sisters approached the time of their anticipated departure from the

company, Wood's responsibilities increased.  As a consequence, Wood felt that he would not be

designing and shooting as many fireworks shows as he had in the past.  Instead, he would be in

the office more and involved in taking on the responsibilities previously handled by Marcy and

Danabeth.  As a result of the added responsibilities, he was getting further and further behind in

his choreography work.

46.     Toward the end of 2007 or early 2008, Ernie Simmons voiced concerns to Doug

Taylor that Matt was overwhelmed and "getting more and more stressed every day."

47.    Wood requested information from Taylor so that the "transition would be effortless," to get a clearer understanding of his responsibilities, and to understand his role in the company.

48.    Wood expressed his concerns to Taylor both verbally and in several detailed e-mails. He specifically expressed concerns about the lack of communication to clients about the departure of Marcy and Danabeth and pressed Taylor to hire additional staff support.

49.    Taylor communicated to Wood that he was a key employee and approved a pay raise of $3000 per year soon after he took over. In December 2007, Taylor met with Wood to give him a favorable performance evaluation and another salary increase to $81,000 per year.

50.    In response to Wood's request for support necessitated by the phasing out of Marcy and Danabeth, Taylor solicited his input on job descriptions and eventually hired Tom Buchser to assist in the Florida office. Due to the fact that Buchser had no knowledge of the fireworks business, however, his hiring actually created more work and more stress for Wood in the short-term. Wood continued to emphasize to Taylor that he needed to hire additional support for the office, but Taylor did not make this a priority.

51.    Wood believed that with the lack of planning and support from the new management and ownership, the situation was "setting up for failure."

52.    In January 2008, Taylor presented Wood with an "Employment Proposal" which outlined terms for a new employment agreement that essentially would have required Wood to assume the roles of both Marcy and Danabeth.

53.    Although Wood trusted the Zambelli family when presented with the 2001 and 2005 Agreements, he did not trust the new owner-operator, Taylor, and therefore never signed

the proposal.

54.    Wood had met Stephen Vitale, President of Pyrotecnico, several years earlier at a baseball winter meeting.

55.    The corporate changes (stock ownership and personnel) and uncertainty prompted Wood to contact Vitale by e-mail in October 2007 to discuss potential employment opportunities.

56.    Vitale was interested in Wood because of his enthusiasm and willingness to improve his skills.  Vitale was never interested in obtaining information from Wood about Zambelli.

57.    During discussions, Wood made it clear to Pyrotecnico that he wanted to follow through with show commitments that he had on behalf of Zambelli and to make sure that he "had [his] complete focus on New Years' Eve."

58.    Although Wood and Pyrotecnico agreed on terms of employment in the weeks prior, Wood did not begin working with Pyrotecnico until March 3, 2008, and he did not perform any services for Pyrotecnico before his start date.

59.    Vitale and Wood executed an employment agreement when Vitale agreed to hire Wood.  This employment agreement contains non-compete and confidentiality provisions.

60.    Pyrotecnico's employment proposal to Wood prohibited him from taking or using any Zambelli information after he left Zambelli.  It was a condition of Wood's employment with Pyrotecnico that he not bring any trade secrets or proprietary information from Zambelli.

14

61.     Pyrotecnico, and its attorneys, reviewed a copy of Wood's 2005 Employment Agreement with Zambelli during their negotiations.  Thus, Defendants proceeded with knowledge that Zambelli might attempt to enforce the restrictive covenants in the 2005 Agreement.  Indeed, Pyrotecnico agreed to pay Wood his salary for two years, should he be enjoined from working for Pyrotecnico, and to indemnify Wood for his litigation expenses.

62.     On February 11, 2008 Wood provided Zambelli with notice that he would be leaving, and that his resignation was effective February 22, 2008.  Taylor immediately traveled to Florida to try to induce Wood to remain with Zambelli.  At that meeting, Wood did not inform Taylor that he was going to work for Pyrotecnico.

63.     After Wood's departure, Zambelli was nevertheless able to perform all shows then under contract including those through July 4th, the busiest season of the year.  However, there are apparently few choreographers with Wood's abilities in the aerial fireworks industry and as of August 2008 Zambelli was still searching for an adequate replacement for him.

64.     Since his employment with Pyrotecnico, Wood does only internal work and does not have client/customer contact.  Wood's duties at Pyrotecnico to date have consisted of:

        (a)     editing music;

        (b)     serving as a technician or shooter on shows;

        (c)     assisting in the design of three shows for existing Pyrotecnico customers; and

        (d)     training.

It is apparent that Pyrotecnico and Wood have actively attempted to minimize his conduct

which may constitute breaches of Wood's employment agreement with Zambelli.

G.    Wood's Exposure to Zambelli's Information

65.    During the course of his employment with Zambelli, Wood was exposed to

the following aspects of Zambelli's business

    (a)    Proposals that Zambelli sent to clients to obtain engagements for firework displays;

    (b)    Meetings with numerous customers;

    (c)    An Excel spreadsheet that contained the formula that Zambelli used to price shows.  Marcy and Danabeth provided this information to Wood in approximately 2006; and

    (d)    Prices that Zambelli paid for shells.  This information was provided to Wood in the fall of 2007.

66.    Upon his departure from Zambelli, with respect to proposals, customer lists, pricing formulas or pricing lists of Zambelli, Wood did not:

    (a)    Keep any documents or material relating to these categories of information;

    (b)    Consciously attempt to memorize or retain any of this information; or

    (c)    Transfer any such information to Pyrotecnico.

67.    At the time of his departure from Zambelli, Wood prepared a list of items that he was returning to Zambelli. In addition to turning in documents and materials such as videos relating to his work, Wood erased all electronic devices, including his Palm Pilot.

68.    Ernie Simmons and Jeff Rolfe, another Zambelli employee, verified that the documents, materials and items referenced on Wood's list were actually returned or

electronically deleted.

H.    State of Competition for Customers and Employees Since Wood Departed

69.    Pyrotecnico lost the City of Orlando, Florida as a customer to Zambelli in the past year.

70.    Zambelli lost two casino customers in New York to Pyrotecnico in the past year. Wood was not involved in the process.

71.    Pyrotecnico won a fireworks competition in August 2008 in Montreal, Canada. The competition included entrants from ten countries, with each entrant representing its home country. Pyrotecnico represented the United States. Wood did none of the design work on the show, but did work as a technician.

II.  CONCLUSIONS OF LAW

A.    Preliminary Injunction Standard

1.    A party which seeks a preliminary injunction must demonstrate the following four factors: "(1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting a preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief." *KOS Pharmaceuticals, Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004). "An irreparable injury is one that 'is not remote or speculative, but actual and imminent and for which monetary damages cannot adequately compensate.'" *Tillery v. Leonard & Sciolla LLP*, 437 F. Supp. 2d 312, 329 (E.D. Pa. 2006) (*quoting FMC Corp. v. Control Solutions, Inc.*, 369 F. Supp. 2d 539, 573 (E.D. Pa. 2005).

2.      "[T]he grant of injunctive relief is an extraordinary remedy . . . which should be granted only in limited circumstances." *Frank's GMC Truck Center, Inc. v. General Motors Corp.*, 847 F.2d 100, 102 (3d Cir. 1988). "The injunction should issue only if the plaintiff produces evidence sufficient to convince the district Court that all four factors favor preliminary relief." *American Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir. 1994); *see also ECRI v. McGraw-Hill, Inc.,* 809 F.2d 223, 226 (3d Cir. 1987).

B.      <u>General Principles Regarding Employment Restrictive Covenants</u>

3.      An employer has a right to protect trade secrets, confidential information, goodwill, customer relationships and unique or extraordinary skills through the use of non-competition and non-solicitation agreements. *John G. Bryant Co. Inc. v. Sling Testing & Repair Inc.*, 369 A.2d 1164, 1167-68 ( Pa. 1977); *Victaulic Co. v. Tieman*, 499 F.3d 227, 235 (3d Cir. 2007). In addition, a restrictive covenant may be used to prevent a competitor from profiting from the "specialized training and skills" of a former employee. *Morgan's Home Equipment Corp. v. Martucci*, 136 A.2d 838, 846 (Pa. 1957). Because the injury resulting from the violation of a noncompetition agreement is difficult to quantify, "[t]he great weight of modern authority is to the effect that one who has been or will be injured [by violation of a covenant not to compete] is ordinarily entitled to the equitable remedy of injunction. . . ." *Records Center, Inc. v. Comprehensive Management, Inc.,* 525 A.2d 433, 436 (Pa. Super. 1987).

4.      Through his employment with Zambelli, Wood acquired the specialized knowledge and skills to successfully choreograph major aerial fireworks displays throughout the country. For example, Wood would not have had the opportunity to choreograph the Times

Square New Year's Eve fireworks display but for his employment by Zambelli. Wood's choreography was marketed and promoted and Wood developed numerous relationships with Zambelli customers. The protection of Zambelli's customer goodwill is a legitimate business interest and Zambelli is entitled to safeguard that interest through a reasonable restrictive covenant in Wood's employment agreement. The specialized training, knowledge and skill Wood acquired during his seven years of employment with Zambelli is also a legitimate interest that may be protected by a reasonable restrictive covenant.

5.      Restrictive covenants have historically been viewed with disfavor as a trade restraint that prevents an individual from earning a living. *Hess v. Gebhart & Co.*, 808 A.2d 912, 917-18 (Pa. 2002) (tracing historical development). Nevertheless, restrictive covenants are enforceable under Pennsylvania law if they are: (1) related to the employment or ancillary to the taking of employment; (2) supported by adequate consideration; (3) reasonably limited in time and geographic scope; and (4) reasonably designed to safeguard a legitimate interest of the former employer. *National Business Services Inc. v. Wright,* 2 F. Supp. 2d 701, 707 (E. D. Pa. 1998); *Gagliardi Bros. v. Caputo,* 538 F. Supp. 525, 527 (E. D. Pa. 1982); *Thermo-Guard, Inc. v. Cochran,* 596 A.2d 188, 193-94 (1991) (superseded by rule on other grounds).

6.      An individual's right to pursue a career and to earn a livelihood is a unique and substantial interest. Thus, the enforcement of restrictive employment covenants is a matter of equity, rather than a pure legal exercise in contractual interpretation. *Hess*, 808 A.2d at 917. In *Morgan's Home Equipment*, 136 A.2d at 846, the Pennsylvania Supreme Court emphasized that in determining whether to enforce a post-employment restrictive covenant, the Court must balance the interest the employer seeks to protect against the important interest of the employee

in being able to earn a living in his chosen profession. *Id.* Thus, a more stringent balancing test is applied when the restrictive covenants are ancillary to employment, as opposed to the sale of a business. *Hess*, 808 A.2d at 920.

7. "Blue penciling," or reasonable alteration of the terms of an employment agreement, is permissible if the court deems a restrictive covenant to be broader than necessary to protect the interests of the former employer. Pennsylvania courts have long held that where a restrictive covenant is found to be overbroad and yet the employer is clearly entitled to some measure of protection from the acts of his former employee, the Court may grant such protection by reforming the restrictive covenant and enforcing it as reformed. *Thermo-Guard*, 596 A.2d at 194 n.9; *see also Sidco Paper Co. v. Aaron*, 351 A.2d 250, 254-55 (Pa. 1976). Consequently, if this Court determines that the scope of the 2005 Agreement is broader than necessary to protect Zambelli's interests, it may "blue pencil" the restrictive covenants.

C.  Breach of the 2005 Employment Agreement

8. By failing to give proper three month notice of termination of his employment to Zambelli and by becoming employed by one of Zambelli's most significant competitors in the pyrotechnic industry, Wood has unquestionably breached the express terms of his employment agreement with Zambelli. Indeed, Defendants do not seriously contest that the terms of the 2005 Agreement were breached. Thus, the primary issue in this case is whether the 2005 Agreement is enforceable. "The law is clear that the burden is on him who sets up unreasonableness as the basis of contractual illegality to show how and why it is unlawful." *John G. Bryant Co.,* 369 A.2d at 1169; *WellSpan Health v. Bayliss*, 869 A.2d 990, 999 (Pa. Super. Ct. 2005). The Court

turns now to several of the contentions raised by Defendants.

      D.      <u>Sufficiency of Consideration</u>

9. "Pennsylvania law provides that when a restrictive covenant is executed after the commencement of employment, the covenant will not be enforced unless it is supported by new consideration provided at the time of the covenant." *In re Verdi*, 244 B.R. 314, 323-24 (Bankr. E. D. 2000); *FresCo-Sys. USA, Inc. v. Bodell*, 2005 WL 3071755, at *3 (E.D. Pa. Nov. 15, 2005). A corresponding benefit to the employee or a change in status or employment responsibilities is sufficient consideration to support a restrictive covenant. *Modern Laundry & Dry Cleaning Co. v. Farrer*, 536 A.2d 409, 411-12 (Pa. Super. Ct. 1988). If a covenant is signed after employment has commenced a "beneficial change in an employee's status [is] sufficient consideration to support a restrictive covenant agreed to after the taking of employment." *M.S. Jacobs & Assocs. v. Duffley*, 303 A.2d 921, 922 (1973).

      Notably, "the Pennsylvania Courts have long held that the adequacy of consideration is not a factor to be considered in determining the validity and enforceability of a contract." *Adelvision, L.P. v. Groff*, 859 F.Supp. 797, 805 (E.D. Pa. 1994) (distinguishing "adequacy" of consideration from "sufficiency" of consideration); *CertainTeed Corp. v. Williams*, 06-CV-2992, 2006 WL 1762660, at * 7 (N.D. Ill. June 27, 2006)(vacated and remanded on other grounds, 481 F.3d 528 (7th Cir. 2007) (construing Pennsylvania law to find that a raise of $250.00 per month was sufficient consideration to support noncompete agreement); *Washowich v. McKeesport Municipal Water Authority*, 503 A.2d 1084, 1087 (Pa. Commw. Ct. 1986). The case relied upon by Defendants, *Gagliardo Bros., Inc. v. Caputo*, 538 F. Supp. 525, 528 (E.D. Pa. 1982), is

distinguishable because the Court in that case found that the raise was totally unrelated to the restrictive covenant.

10.   Wood received a significant raise (from $1,571.81 per pay period to $2,115.39 per pay period) as consideration for signing the 2005 Employment Agreement.  Wood's raise, contemporaneous with the signing of the 2005 Employment Agreement, is sufficient consideration to render the agreement valid.[2]


E.   Whether the "New" Zambelli Can Enforce the Agreement

11.   Defendants contend that Plaintiff cannot enforce the restrictive covenants contained in Wood's 2005 Employment Agreement because Zambelli is a "new," or "different," company.  Defendants make two related arguments: (1) that the company became "new" as of May 24, 2007, the date of the closing on the stock purchase/transfer transaction and the replacement of the entire corps of officers and directors of the company such that it was no longer a family-run, close-knit company; and/or (2) that the company became "new" as of the end of 2007, due to the resignation or phasing out of Marcy and Danabeth.  Zambelli argues that the entity with which Wood executed the 2005 Agreement remains intact as the same corporation because the transaction was structured as a stock sale and not as an asset acquisition.  The contentions of both parties have considerable appeal.

12.   The Court has found, as a factual matter, that all of the officers and shareholders of the corporation and all but one of the directors changed between the time Wood executed the

_____

[2]The Court need not reach the question of whether  the Uniform Written Obligations Act, as codified at 33 P.S. § 6 (2007), independently provides the necessary consideration to support a restrictive covenant.

2005 Agreement and his resignation in February 2007.  The Court has further found that the

basic character of Zambelli as a family owned and operated business changed substantially.  On

the other hand, Wood entered into a contract with a corporate entity, Zambelli Fireworks

Manufacturing Co., Inc., which has maintained its corporate identity intact throughout the

relevant time period.  The issue is how to evaluate whether there has been a "change" in the

corporation sufficient to permit an employee to disavow a restrictive covenant in an employment

contract.  Do employee restrictive covenants constitute an exceptional circumstance in which the

Courts should disregard the corporate form and instead evaluate the operational characteristics of

the corporation?  To put it another way, should the focus of the analysis be on the relationship

between the "***new***" corporation and the alleged ***old corporation*** or on the relationship between

the "***new***" corporation and the ***employee***?

13.      The Court concludes that the May 24, 2007 stock sale, by itself, did not

invalidate the 2005 Agreement.  As a matter of hornbook law,  the Zambelli corporation that

existed before the stock purchase and the Zambelli corporation that exists after the stock

purchase transaction are one and the same corporation.  Generally, contracts continue to be valid

even if stock ownership of a corporation changes.  Indeed, the ownership and management of

publicly-traded corporations is constantly changing.  After a merger or acquisition through the

sale of stock, the surviving entity obtains both the assets and liabilities of the former entity

because the corporation continues its independent legal existence.[3]  An acquisition of stock

"vests" contractual rights in the acquiring company as a matter of law and does not require a

---

[3]Vitale testified that he does not acquire companies through stock purchases to avoid
successor liability issues.  However, there is a corresponding successor benefit in a stock
purchase due to the continuity of existing rights, including contracts.

transfer or assignment to be effective. 15 Pa. C.S.A. § 1929(b) & Amended Committee

Comment 2001 (citing *Sante Fe Energy Resources, Inc. v. Manners*, 635 A.2d 648 (Pa. Super.

1993)). Zambelli Fireworks Manufacturing Co., Inc., is a legal entity that continues to exist in

the same form today. Thus, the "new Zambelli" suceeded to the rights and obligations regarding

Wood's 2005 employment agreement by operation of law.

14.     Restrictive covenants need not be assigned when there is a sale of the corporate

employer's stock. *Siemens Medical Solutions Health Services Corp. v. Carmelengo,* 167 F.

Supp. 2d 752 (E. D. Pa. 2001). In *Siemens*, a purchaser acquired all of the stock of Shared

Medical Systems Corporation ("SMS") and changed the name of the corporation to Siemens

Medical Solutions Health Services Corporation ("Siemens"). The gravamen of the defendant's

argument in *Siemens* was that "the purchase of 100% of SMS's stock by Siemens in July 2000

constituted a defacto change in [the employee's] employer with the result that [the employee]

was no longer bound by the terms of his employment agreement." *Id.* at 757. The *Siemens* Court

rejected this argument, noting that "[i]t is a basic tenet of corporate law that a change in stock

ownership is merely a transfer of shareholder rights which does not, in and of itself, normally

affect the existence of the corporate entity." *Id.* at 758. The restrictive covenants in the

employment agreement were enforceable because the 'old' and 'new' employer were merely two

different names for the same corporate entity. *Id.* at 758-59. The Court held that the 'new'

employer could enforce the restrictive covenant that the employee signed with the 'old' employer

"because there [had] been no change in the corporate identity of his employer." *Id.* at 759.[4]

---

[4]Judge O'Neill also noted that "to the extent that this determination conflicts with the decision of
the Court in *[Joyner Sports Medicine Institute v. Stejbach*, 45 Pa.D.& C.4th 242 (Dauphin Cty.
1999)], I conclude that the Supreme Court of Pennsylvania would decline to follow that Court's

This analysis is applicable to this case. The "sale" of Zambelli was merely a transfer of its stock; consequently, there has been no legal change in the "corporate identity of [Wood's] employer." *Accord Corporate Express Office Products, Inc. v. Phillips*, 847 So.2d 406, 414 (Fla. 2003) ("based on fundamental principles of commercial transactions and the applicable statutes, we hold that, in contrast to an asset purchase, neither a 100 percent purchase of corporate stock nor a corporate merger affects the enforceability of a noncompete agreement").

15. Defendants cite *Hess*, 808 A.2d at 922, for the proposition that employment contracts are personal to the performance of both the employer and employee, "the touchstone of which is the trust that each has in the other." The *Hess* Court further explained that an employee's "confidence in the character and personality of one employer does not mean that the employee would be willing to suffer a restraint on his employment for the benefit of a stranger to the original undertaking." *Id.* Thus, Defendants contend that the Court must evaluate the trust, character and personality of the employer, and whether Doug Taylor was a "stranger to the original undertaking."

*Hess* is instructive but not dispositive of the instant circumstance. The specific issue in *Hess* was whether the employment contract at issue could be ***assigned*** in the absence of a specific assignability provision in an asset purchase transaction. As Zambelli accurately points out, there was no need, or opportunity, to assign Wood's contract because the corporate identity remained the same. Indeed, *Hess* cited favorably to *Siemens*.

16. The Court concludes that *Joyner Sports Medicine Inst., Inc. v. Stejbach*, 45 Pa. D.&C.4th 242 (Ct. Common Pleas 1999), is also distinguishable. *Joyner* did involve a stock sale

reasoning." 167 F.Supp.2d at 759-60. *Joyner* is distinguishable, as discussed *supra*.

but, in addition, the acquiring company unilaterally forced the employees to accept a new, less-favorable employee benefits package. Thus, the new owner significantly changed the employees' conditions of employment. In the instant case, by contrast, the stock sale did not result in substantial changes in Wood's job duties and he received a raise. It was not until Marcy and Danabeth left active employment, some six months later, that Wood actually considered his conditions of employment to have changed significantly in what he perceived to be a deleterious manner. In summary, the May 2007 transaction involving Zambelli stock did not render Wood's 2005 Employment Agreement to be unenforceable.

17. Wood's alternative argument, that Zambelli had significantly changed as a result of the new ownership and management such that it was no longer a family owned and operated business, is more weighty. The discussion in *Hess* regarding the importance of trust and the expectations of the employer and employee at the time of the contract is persuasive. The Court recognizes that as a practical matter, Wood's expectations regarding his future employment were affected by the change in ownership and subsequent overall change in management. Wood signed his employment agreement with the legitimate expectation that Zambelli would continue to be a family owned and operated business and Zambelli's character as a family-run business was demonstrably important to Wood. During the course of 2007, not only did a group of non-family investors acquire 50% of Zambelli stock, but Doug Taylor as CEO took effective control over the entire operations of the company. George Zambelli, Sr., had died and Marcy and Danabeth, the family members with whom Wood had worked closely for virtually his entire career, resigned and appeared to be disgruntled by the transition. Taylor had a financial background and no prior experience whatsoever in the fireworks industry. In sum, the character

26

of Zambelli as a family-run business changed overall in the approximately nine months between the May 2007 stock transfer transaction and Wood's resignation in February 2008.[5]

18.     Nevertheless, the Court concludes that the changes in the stock ownership, management and character of the Zambelli corporation do not render the restrictive covenants in the 2005 Agreement entirely unenforceable.  With independent research, the Court has found no case which has disregarded the legal continuity of an employer following a stock transfer transaction and declines to venture into that uncharted legal territory under the facts and circumstances of this case.

19.     There was simply no fundamental change in Zambelli that occurred contemporaneously with Wood's resignation in February 2008.  Taylor became CEO in May 2007.  Wood's job duties generally remained the same after the stock transfer transaction.  Marcy and Danabeth had contemplated reduced work hours after September 2007 and Wood would have been aware that their participation in the business would steadily decline over the ensuing months.  Thus, many of the changes to Zambelli of which Wood now complains occurred long before he took steps to resign.  Wood's subjective perception that he was being set up for failure does not render his employment agreement unenforceable.  To recognize an employee's subjective displeasure with job conditions as a justifiable basis for the breach of an employment agreement could frustrate the legitimate purposes of restrictive covenants and create a flood of litigation.  Moreover, under the facts of this case, Taylor clearly communicated to Wood that he continued to be a valued employee and that message was reinforced by two raises.  In summary,

---

[5] Obviously, if the continuation of Zambelli as a family-owned and operated business was a material condition, it would have been prudent to have expressly articulated that condition in  the text of the 2005 Agreement.

the Court concludes that the changes in ownership, management and operation of Zambelli do not render the 2005 Agreement unenforceable.

20.     Accordingly, the Court concludes that the alleged "new" Zambelli may enforce the 2005 Employment Agreement which it had with Wood and therefore Plaintiff is likely to succeed on the merits of its claim against Wood for breach of contract.

21.     Based on the testimony and evidence thus far presented, the Court observes that Plaintiff is unlikely to succeed on the merits of its claims for breach of fiduciary duty of loyalty, misappropriation of trade secrets, interference with contractual relations or prospective economic advantages, unfair competition and civil conspiracy as there is a dearth of evidence to support any breach of those duties by either Defendant.

F.     Reasonableness of Time and Scope of Restrictions

22.     To be valid and enforceable, the length of time and scope of a restrictive covenant should be no greater than is reasonably necessary to protect the employer's legitimate business interest.  "The reasonableness of the temporal and geographic aspects of a restrictive covenant must be determined in light of the nature of the employer's interest sought to be protected." *Boldt Machinery & Tools, Inc. v. Wallace*, 366 A.2d 902, 907 (1976).  The 2005 Employment Agreement purports to restrict Wood from engaging in or working for any company in the pyrotechnic business for a period of two years anywhere in the continental United States.

23.     The fireworks business is largely seasonal, with the heaviest peak of activity around July 4th.  In addition, New Year's Eve shows and other municipal and corporate celebrations occur throughout the year.   Shows are booked far in advance and most if not all of

the July 4, 2008 shows were booked before Wood left Zambelli. In essence, the two-year time

restriction, if enforceable, would prevent Wood from participating in the July 4, 2008 and 2009

seasons and, in large part, the sales process for the July 4, 2009 and 2010 seasons. Wood's

talents are difficult to replace and his loss is likely to impact Zambelli during the July 4, 2009

and 2010 seasons. The Court concludes that a two-year restriction from the date of Wood's

cessation of employment with Zambelli, i.e., until February 22, 2010, is reasonable.

      24.    The 2005 Agreement defines the geographic restriction upon Wood's activities in

the pyrotechnic business as the continental United States. Courts have upheld covenants

not-to-compete with a national scope, where appropriate. *See, e.g .National Business Services

Inc. v. Wright*, 2 F.Supp.2d 701, 708 (E.D. Pa. 1998) ("Although nationwide covenants are

disfavored, in this case both ASI and Impact are nationwide businesses, and Wright, while

employed by ASI, had extensive contacts with customers all over the nation."); *Graphic

Management Associates v. Hatt*, 1998 U.S. Dist. LEXIS 3949, at * 33 (E.D. Pa. March 18, 1998)

(upholding restriction covering North America); *Volunteer Firemen's Insurance Services, Inc. v.

CIGNA Property and Casualty Insurance Agency*, 693 A.2d 1330, 1338 (Pa. Super. 1997)

(upholding nationwide noncompete agreement because the territorial scope of the covenant was

comparable to the market actually serviced during the course of the relationship); *Kramer v.

Robec, Inc.*, 824 F.Supp. 508, 512 (E.D. Pa. 1992) ("Since competition in the computer market is

world-wide and since Robec distributes throughout the nation and overseas, the geographic

extent of the covenant—the United States—is reasonable.").

      Both Zambelli and Pyrotecnico are nationwide businesses. Wood, while employed with

Zambelli, performed services in many regions of the continental United States, and prior to his

resignation he was assigned primary responsibility for customers in fourteen states. Most importantly, Wood can choreograph a fireworks display from his computer in his home office for any customer located anywhere in the United States. Thus, the geographic location is of limited relevance to the choreographing process.

However, a complete bar on the ability of Wood to participate in any activity in the pyrotechnic industry in the entire continental United States, would literally prevent him from engaging in his chosen profession, is not necessary for the protection of Zambelli's legitimate business interests, and therefore, is overbroad under the circumstances of this case. The mere fact that Wood could work on shows for Pyrotecnico customers does not directly harm Zambelli. For example, the fact that Wood performed a show in New York City Times Square should not give Zambelli a protectible interest in an unrelated show to be performed in Buffalo, New York. The Court is persuaded by the reasoning in *Thermo-Guard*, 596 A.2d at 194, which explained as follows:

> the trial court protected Thermo-Guard's interest in customer goodwill generated by appellees by issuing an injunction prohibiting appellees from contacting or developing any relationship with any of Thermo-Guard's present customers or prospective customers who became known to appellees through their employment with Thermo-Guard. Once this interest was protected, the trial court could perceive no remaining legitimate business interest for Thermo-Guard to protect through a general injunction against competition by appellees. We agree.

The Court concludes that Wood should similarly be enjoined from revealing to Pyrotecnico in any manner whatsoever or from contacting or developing any business relationship with any of Zambelli's present or prospective customers who had contact with or became known to Wood through his employment with Zambelli for the two-year restrictive time

period. Wood will also be enjoined from designing or choreographing aerial pyrotechnic displays, which was the specific expertise that he developed while at Zambelli. In addition, Defendants shall be enjoined from promoting Wood's choreography talent and/or accomplishments while employed at Zambelli in its advertising, marketing or sales efforts for the term of the restrictive covenant. A broader restriction would not be reasonable.

G.    Irreparable Harm

25.    Pennsylvania Courts have uniformly recognized that a violation of a noncompetition agreement results in harm which is not compensable by money damages. *John G. Bryant v. Sling Testing & Repair, Inc.,* 471 Pa. 1, 369 A.2d 1164; (1977); *Records Center, Inc. v. Comprehensive Management, Inc.*, 363 Pa. Super. 79, 525 A.2d 433 (1987). As stated by the Pennsylvania Supreme Court in *Bryant*, 369 A.2d at 1167:

> It is not the initial breach of a covenant which necessarily established the existence of irreparable harm but rather the threat of the unbridled continuation of the violation and the resultant incalculable damage to the former employer's business that constitutes the justification for equitable intervention.

"Harm is irreparable when it cannot be adequately compensated in damages, either because of the nature of the right that is injured, or because there exists no certain pecuniary standards for the measurement of damages. *National Business Services, Inc.*, 2 F.Supp.2d at 709 (finding that the potential injury to the former employer's goodwill and the potential use of the former employer's confidential information constituted irreparable harm). In recognizing that an injury which results from the violation of a noncompetition agreement is difficult to quantify, the Pennsylvania Superior Court has stated that "[t]he great weight of modern authority is to the

31

effect that one who has been or will be injured [by violation of a covenant not to compete] is ordinarily entitled to the equitable remedy of injunction…" *Records Center, Inc.*, 525 A.2d at 436.

26.     Wood had a reasonably significant degree of customer contact prior to his departure from Zambelli, he was intimately aware of Zambelli's operations through his close work with Marcy and Danabeth, Zambelli promoted and marketed itself based upon Wood's unique talents and abilities, and Wood's abilities were recognized by some number of Zambelli's clients. The harm Zambelli is suffering as a result of Wood's breach of his employment agreement and subsequent employment by Zambelli's competitor, Pyrotecnico, is not quantifiable. This factor clearly weighs in favor of the Plaintiff.

H.     Balancing the Harms

27.     Wood will not suffer direct monetary harm if the 2005 Agreement is enforced because Pyrotecnico has agreed to indemnify him for any loss of salary and legal expenses he may incur for the duration of any non-compete restriction. *See National Business Services,* 2 F.Supp.2d at 709 (finding that the former employee would not suffer greater harm if the injunction was enforced, in part, because her new employer had indemnified her). On the other hand, Wood has single-mindedly pursued a livelihood in the narrow, specialized fireworks industry throughout his educational and career history. Enforcement of the 2005 Employment Agreement restrictions in toto would bar Wood from pursuing his chosen profession for a period of time. By modifying the restrictive covenants such that Wood is able to maintain his employment at Pyrotecnico, while preventing him from designing or choreographing aerial pyrotechnic displays and from having contact with customers and prospective customers

throughout the continental United States whom he met or became aware of through his employment at Zambelli, the interests of both sides are fairly balanced.

28.     In reasonably balancing the harms to each side, the Court is influenced by the fact that Wood and Pyrotecnico made a knowing, calculated decision to breach the 2005 Agreement in the hope that it would be unenforceable.

29.     Therefore, the Court concludes that the balance of the equities favors the enforcement of the 2005 Employment Agreement as modified above.


I.     Public Interest

30.     Under appropriate circumstances, "the public interest is best served…by upholding the restrictive covenants freely entered into by [the employee].  Granting a permanent injunction to [the former employer] will discourage unfair competition, the misappropriation and wrongful use of confidential information and trade secrets and the disavowal of freely contracted obligations."  *National Business Services,* 2 F.Supp. 2d at 709.

31.     Under the facts as found in this case, the public interest will be served by enforcement of the 2005 Agreement as modified.

An appropriate Order follows.

McVerry, J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ZAMBELLI FIREWORKS** | ) | |
| **MANUFACTURING CO., INC. doing** | ) | |
| **business as ZAMBELLI FIREWORKS** | ) | **2:08-cv-415** |
| **INTERNATIONALE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | |
| | ) | |
| **MATTHEW WOOD and** | ) | |
| **PYROTECNICO F/X, LLC.,** | | |
| **Defendants.** | | |

## <u>ORDER OF COURT</u>

AND NOW this 21st day of January, 2009, in accordance with the foregoing Findings of

Fact and Conclusions of Law, it is ORDERED, ADJUDGED and DECREED that Plaintiff's

MOTION FOR PRELIMINARY INJUNCTION (Document No. 4) is **GRANTED IN PART**.

The 2005 Employment Agreement between Zambelli and Matthew Wood is enforceable,

however the restrictive covenants are modified as follows:  Matthew Wood is hereby enjoined

for a period of two years following the cessation of his employment with Zambelli on February

22, 2008 (i.e., until February 22, 2010) from designing or choreographing aerial pyrotechnic

displays;  Matthew Wood and Pyrotecnico F/X, LLC are enjoined for the same two-year period

from contacting or soliciting business from any customer(s) or client(s) of Zambelli within the

continental United States with whom Wood had business contact as an employee, agent or

representative of Zambelli during the period of his employment with Zambelli; and Matthew

Wood and Pyrotecnico F/X, LLC are enjoined for the same two-year period from publicizing,

promoting or referencing Wood's design or choreography talent, experience and/or

accomplishments while employed at Zambelli in any advertising, marketing or sales endeavors.

In accordance with the foregoing, Paragraph 7 of the 2005 Employment Agreement is "blue-penciled" and Wood and Pyrotecnico are enjoined as follows:

## NON COMPETITION

7.       **During the term of this Agreement and for a period of two years following termination of this Agreement (FEBRUARY 22, 2008), for any cause whatsoever, Matthew Wood shall not directly or indirectly, either as an employee, owner, or otherwise, anywhere within the geographical area of Continental United States engage in any manner in the DESIGN AND/OR CHOREOGRAPHY OF AERIAL pyrotechnic** ~~business~~ **DISPLAYS and Matthew Wood AND ANY SUCCESSOR PYROTECHNIC EMPLOYER** ~~shall not take any position of employment or ownership with any company or companies engaged in the sale or production of pyrotechnic displays if that company does any business in the aforementioned geographical area.~~ **Matthew Wood for two years following termination of this Agreement shall not contact or solicit business with or from any customer, customers, client, OR clients OF ZAMBELLI,** ~~or any other person or entity~~ **with whom** ~~he~~ **WOOD had business contact as an employee, agent or representative of Zambelli during his period of employment.  Nor shall Matthew Wood during two years following termination of this Agreement act in any manner either as an employee, owner, consultant, agent, principal, employer, partner, corporate officer, or in any other capacity in any manner INDIVIDUALLY OR PERSONALLY engage or participate in any ACTIVITY** ~~business~~ **that is in competition, in any manner with the business of Zambelli.  During the**

**aforementioned two year period, Matthew Wood shall not directly or indirectly solicit or entice for employment any employee of Zambelli. Matthew Wood acknowledges that each of the restrictions set forth in this section is a material condition of this Agreement to employee Matthew Wood, and further, that the parties believe such restrictions are reasonable in duration and scope and that a breach thereof will cause irreparable harm to Zambelli and therefore Zambelli will be entitled to temporary and permanent injunctive relief in addition to all other remedies entitled to at law or in equity.**

In all other respects, the remaining relevant provisions of the Employment Agreement of June 2, 2005 are in full force and effect.

The Court notes the security provision in Fed. R. Civ. P. 65(c). However, with no party having requested same and the Court seeing no imminent need for bond, security will be waived at this time subject to future request.

BY THE COURT:

s/ Terrence F. McVerry
United States District Court Judge

cc:
ZAMBELLI FIREWORKS MANUFACTURING CO.
     Mark A. Willard, Esquire
     Email: mwillard@eckertseamans.com

     Christina I. Kepplinger, Esquire
     Email: ckepplinger@eckertseamans.com

MATTHEW WOODS
     David G. Oberdick, Esquire
     Email: dgo@muslaw.com
     Jane Lewis Volk, Esquire
     Email: jlv@muslaw.com
     Mary C. McGinley, Esquire
     Email: mcm@muslaw.com

PYROTECHICO FX, LLC.
     Manning J. O'Connor, II, Esquire
     Email: moconnor@leechtishman.com
     Patrick Sorek, Esquire
     Email: psorek@leechtishman.com